UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANNIA

| | |
|---|---|
| NICHOLAS GEORGE<br>202 Deaver Road<br>Wyncote, PA  19095<br><br>        Plaintiff,<br><br>   v.<br><br>WILLIAM REHIEL, Philadelphia Police Officer, in his individual capacity;<br><br>EDWARD RICHARDS, JR., Philadelphia Police Sergeant, in his individual capacity;<br><br>JOHN DOE 1, JOHN DOE 2, AND JANE DOE 3, employees of the Transportation Security Administration, in their individual capacities;<br><br>JOHN DOE 4 AND JOHN DOE 5, Philadelphia Police Department Detectives, in their individual capacities; and<br><br>UNITED STATES OF AMERICA,<br><br>        Defendants. | No. 2:10-cv-00586-EL<br><br>JURY TRIAL DEMANDED |

**AMENDED COMPLAINT FOR DAMAGES**
**(Violation of First and Fourth Amendment Rights; Federal Tort Claims Act)**

1.    Plaintiff Nicholas George, a 21-year-old student at Pomona College at the time of the events described in this Complaint, was detained, abusively interrogated, handcuffed, and jailed for several hours in a holding cell solely because he passed through an airport screening checkpoint with a set of Arabic-English flashcards and a book critical of American foreign policy.

2.     Mr. George was attempting to travel from the Philadelphia International Airport to California in order to resume his studies, including Arabic language studies. At the airport screening checkpoint he was stopped and detained for 30 minutes by TSA screeners and abusively interrogated for an additional 15 minutes by a TSA supervisor. He was then handcuffed, without explanation, by a Philadelphia police officer and transported to the airport police station where he was jailed for approximately four hours, more than two of them with his hands cuffed behind his back.  Mr. George was released only after having been subjected to an additional 30 minutes of custodial interrogation at the hands of two Philadelphia Police Department (PPD) detectives, one affiliated with the PPD Homeland Security unit (PPD-HS) and the other with an FBI Joint Terrorism Task Force (JTTF).

3.     The conduct of the TSA officials, the Philadelphia police, and the PPD-HS/JJTF detectives violated Mr. George's Fourth Amendment right to be free from unreasonable seizure, his First Amendment right to freedom of speech, and also constituted falsely arrest, false imprisonment, tortious battery and assault, and false light invasion of privacy.  He brings this lawsuit in order to vindicate those rights.

## PARTIES

4.     Plaintiff Nicholas George was a 21-year-old citizen of the United States and resident of Montgomery County, Pennsylvania at the time of the events described in this complaint.  He was a student at Pomona College in Claremont, California, where he was studying toward a double-major in Physics and Middle-Eastern Studies.  Mr. George began studying the Arabic language in his first year of college as part of his Middle Eastern studies major.  He has spent a semester studying abroad in Jordan and has

traveled to several other countries, including Egypt, Sudan, Ethiopia, Malaysia, and Indonesia.

5.      John Doe 1 and John Doe 2 were employees of the Transportation Security Administration working as screeners at a security checkpoint at the Philadelphia Airport at the time of the events giving rise to this action.  Each was responsible for detaining Mr. George for 30 minutes at the screening area and, upon information and belief, they summoned the TSA Supervisor known here as Jane Doe 3, as well as the Philadelphia Police Department, for further interrogation, detention, and arrest of Mr. George.  John Does 1 and 2 are sued here in their individual capacities.

6.      Jane Doe 3 was an employee of the Transportation Security Agency at the time of the events giving rise to this action.  Upon information and belief, Jane Doe 3 held a position that involved supervising airport screeners, including Defendants John Does 1 and 2.  Jane Doe 3 interrogated Mr. George in a hostile and aggressive manner, continued his detention, and turned him over to Defendant Rehiel to be handcuffed, arrested, jailed, and further interrogated.  Jane Doe 3 is sued in her individual capacity.

7.      Defendant William Rehiel was an officer of the Philadelphia Police Department at the time of the events giving rise to this action.   He handcuffed Mr. George in the airport terminal, jailed him in a cell in the airport police detachment, failed to remove his handcuffs upon jailing him, and left him in the cell for more than two hours.  Defendant Rehiel was acting under color of state law during the events described in this Complaint.  He is sued in his individual capacity.

8.      Defendant Edward Richards, Jr. was a sergeant of the Philadelphia Police Department at the time of the events giving rise to this action.  On information and belief,

Defendant Richards was the duty sergeant for at least part of the time during which Mr.

George was incarcerated.  Defendant Richards prolonged Mr. George's detention until

John Does 4 and 5 arrived to interrogate him.  Defendant Richards was acting under color

of state law during the events described in this complaint.  He is sued in his individual

capacity.

9.      John Doe 4 and John Doe 5 were detectives of the Philadelphia Police

Department at the time of the events giving rise to this action.  John Doe 4 was affiliated

with the PPD-HS.  John Doe 5 was affiliated with the JTTF.  John Does 4 and 5

prolonged Mr. George's detention and interrogated him for approximately 30 minutes.

They are both sued here in their individual capacities.

10.     The United States of America is the appropriate defendant under the

Federal Tort Claims Act.

11.     At all times relevant to this Complaint, Doe defendants 1-5 were acting

within the scope of their offices or employment.

## JURISDICTION AND VENUE

12.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,

1343(a)(3), and 1346(b).

13.     This complaint is for money damages based upon civil rights violations

committed by Federal and State officials contrary to the First and Fourth Amendments to

the United States Constitution.  This action is authorized and instituted pursuant to *Bivens*

*v. Six Unknown Named Agents*, 403 U.S. 388 (1971) and 42 U.S.C. § 1983.  This Court

has authority to award costs and attorney's fees pursuant to 42 U.S.C. § 1988 and 28

U.S.C. § 2412.

14.     On April 9, 2010 Administrative Tort Claims were submitted by Plaintiffs to the Transportation Security Administration and the U.S. Department of Justice Federal Bureau of Investigation.  The claims were both denied on June 11, 2010.

15.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1391(e).

## FACTUAL ALLEGATIONS

16.     On Saturday, August 29, 2009, Plaintiff Nicholas George was scheduled to fly on Southwest Airlines from Philadelphia International Airport to Ontario International Airport in California, via Phoenix.  He was traveling to California in order to begin his senior year at Pomona College.

### Arrival at Airport and Check-in

17.     After Mr. George arrived at the airport, he waited in the line for check-in and, upon reaching the counter, he presented his identification and received a boarding pass for his flight without incident.  He then proceeded to the security screening area.

18.     Mr. George carried a single piece of carry-on luggage, a black athletic bag.  Inside the athletic bag were two small speakers (approximately 10" x 6" x 6") that he intended to use with his stereo system in California.

19.     As Mr. George approached the x-ray screening device, a TSA official—not a defendant in this action—asked Mr. George to present his identification and boarding pass.  Mr. George complied.  The TSA official asked Mr. George what was inside his carry-on bag.  Mr. George responded that the bag contained his speakers.  The TSA official then asked Mr. George to step aside.  Mr. George complied.  The TSA

official asked Mr. George to remove the speakers, so that they could be passed through the x-ray screening device separately.  Mr. George complied.

20.     Mr. George placed his carry-on bag and his speakers on the belt.  He emptied his pockets of all items containing metal, including his wallet and cell phone, and took off his shoes.  These items were also placed on the belt to pass through the screening device.

21.     Mr. George stepped up to the metal detector.  He walked through the metal detector without incident.  The detector made no sound.

22.     The TSA official who was operating the metal detector—not a defendant in this action—nevertheless asked Mr. George to step aside and to wait.  This TSA official asked to see Mr. George's boarding pass.  Mr. George showed his boarding pass to the official.  There was a glass enclosure located next to the metal detector that was used for additional screening.  After this glass-enclosed screening area had been vacated by a previous passenger, the TSA official directed Mr. George to enter.  Mr. George stepped into the glass enclosure as directed.

23.     Inside the glass enclosure another TSA official (Defendant John Doe 1) asked Mr. George to empty his pockets.  Mr. George had already emptied his pockets of any items containing metal, so among the only items remaining was a set of flashcards.  Mr. George handed the flashcards to the TSA official, as instructed.

<u>English-Arabic Flashcards</u>

24.     Each flashcard had Arabic words on one side and English translations on the other.  The flashcards were of the kind that would commonly be used by a person

studying a foreign language. Indeed, Mr. George used the flashcards as a tool for learning Arabic vocabulary.

25.   Mr. George had been studying Arabic for three years, beginning in his first year of college, in connection with his Middle-Eastern Studies major. Mr. George had spent a semester in Jordan studying Arabic as part of a study abroad program organized by the Council on International Educational Exchange, a U.S. non-profit organization founded in 1947. He received credit at Pomona College for the courses he took in Jordan. Upon completing the program, he spent approximately five weeks traveling in Ethiopia, Egypt, and Sudan—the latter two of which are Arabic-speaking countries—as a tourist and in order to practice his Arabic language skills.

26.   Mr. George has a strong interest in the contemporary politics of the Middle East, especially as they involve and affect the United States. Mr. George sought to learn Arabic in order to be able to read and understand what was being reported and debated in contemporary Middle Eastern newspapers, television programs, and other publications or media.

Detention by TSA Screeners

27.   The TSA official to whom Mr. George handed the flashcards (Defendant John Doe 1) proceeded to inspect them. The official did not make any comment and did not indicate that there was any kind of problem. He nevertheless took Mr. George to a different screening area. Mr. George waited there while that TSA official and another TSA official (Defendant John Doe 2) further inspected his bag and the flashcards. One of these two TSA officials swabbed Mr. George's cell phone in order to run a test for explosives. The test returned a negative result. The TSA officials found nothing among

Mr. George's personal effects that posed a safety risk or was otherwise prohibited in the "sterile" area of the airport and aboard an airplane.  Indeed, Mr. George was not carrying any prohibited items or items that could pose a safety risk.  Nor was Mr. George carrying anything suggestive of criminal or otherwise prohibited activity.

28.    It soon became apparent to Mr. George that the two TSA officials were stalling.  The TSA officials completed their search of Mr. George's carry-on items within ten minutes.  One of the officials flipped through the pages of books that Mr. George had among his carry-on items.  He swabbed Mr. George's cell phone for a second time and half-heartedly re-examined Mr. George's other carry-on items.  The official also attempted to make small talk, asking Mr. George if he had seen the recent Philadelphia Phillies baseball game.  After Mr. George responded in the affirmative and offered his opinion of the game, the TSA official admitted that he had not seen the game and did not generally watch the Phillies.

29.    The other official stepped away and placed a phone call.  He was speaking on the phone for some time.  Mr. George could not hear the call but believed that he might have been speaking with a TSA supervisor.  On information and belief, the TSA official was speaking on the phone with a TSA supervisor or other official about Mr. George's screening, including the English-Arabic flashcards.

30.    The two TSA officials kept Mr. George in the side screening area for 30 minutes.  The TSA officials maintained Mr. George's property—including his wallet, identification, passport, and boarding pass—in their custody.  At no point did the TSA officials return, or offer to return, Mr. George's property to him.  During this period of

time Mr. George was detained by the TSA officials.  Mr. George was not free to leave

and believed that he was not free to leave.

31.     During this time, Mr. George became increasingly concerned that he

would miss his flight.  He asked the TSA officials how much longer he would have to

wait and mentioned to the officials that his flight was leaving shortly.

32.     The TSA officials did not explain to Mr. George why he could not proceed

to the gate, nor did they explain to him the reason that he was being delayed and

detained.

### Detention and interrogation by TSA Supervisor

33.     After 30 minutes, a TSA Supervisor arrived (Jane Doe 3).  The Supervisor

immediately began questioning Mr. George in a hostile and aggressive manner.  Mr.

George responded to all questions truthfully and to the best of his ability, in a polite and

calm manner.

34.     The TSA Supervisor's questioning proceeded, in part, as follows (as best

recalled by Plaintiff):

**Jane Doe 3:**    How do you feel about 9/11?

35.     Mr. George responded that he thought 9/11 was a terrible event.

36.     At this point, the Supervisor noted that Mr. George had with him a book

entitled "Rogue Nation: American Unilateralism and the Failure of Good Intentions," by

Clyde Prestowitz, published by Basic Books in 2004.  The book has been described by

General Wesley Clark as "a fascinating big picture look at America and its place in the

world [that] should help provoke the kind of discussion that we have long needed."

Joseph Nye, former Assistant Secretary of Defense for International Security Affairs, has

described the book as "[a] conservative's sober warning of the dangers of unilateralism and the temptations of empire."

37.     After noticing the book, the TSA Supervisor continued her hostile and aggressive questioning as follows:

**Jane Doe 3:**   You obviously read.  You know who did 9/11?

38.     Mr. George, surprised by the question, did not immediately answer.  The TSA Supervisor repeated the question:

**Jane Doe 3:**   You know who did 9/11?

**Plaintiff:**      Osama bin Laden.

**Jane Doe 3:**   Do you know what language he spoke?

**Plaintiff:**      Arabic.

39.     At this point the TSA Supervisor held up Mr. George's flashcards and stated:

**Jane Doe 3:**   Do you see why these cards are suspicious?

40.     Mr. George was surprised and intimidated by these questions.  Mr. George told the TSA Supervisor that he was carrying the flashcards because he was studying Arabic in college.  Nevertheless, the TSA Supervisor's interrogation lasted approximately 15 minutes.

41.     Mr. George was detained by the three TSA officials—John Does 1 and 2 and Jane Doe 3—during this interrogation.  He was not free to leave and believed that he was not free to leave.  He reasonably believed that he was obligated to answer the TSA Supervisor's questions.  The three TSA officials maintained custody of his property

throughout the interrogation.  None of the TSA officials, including the TSA supervisor, ever suggested that Mr. George could leave the screening area if he wished.

<u>Handcuffing by Philadelphia Police Officer Rehiel</u>

42.     The TSA Supervisor (Jane Doe 3) was in mid-sentence when a police officer arrived.  On information and belief, this was Defendant Rehiel, an officer of the Philadelphia Police Department.

43.     The first and only thing that the officer said was: "Place your hands behind your back."  Mr. George complied and the officer handcuffed Mr. George.

44.     Mr. George was shocked by the arrival of the police officer and by the fact that he had been handcuffed.

45.     The officer took hold of Mr. George's arms and led him, handcuffed and in plain view of other passengers, through the terminal and down a set of stairs to the airport police station.

46.     While he was being led away, Mr. George asked, "Can you tell me what is going on?"  The officer replied, "We are taking you for extra screening."  No further explanation was given.  Mr. George was not informed of the reasons why he had been detained, handcuffed, and arrested, or why "extra screening" was necessary.

47.     During this time Mr. George remained shocked and bewildered as to what was transpiring.  Mr. George had never been arrested before.  He did not know why he was being arrested, where he was being taken, how long he would be detained, how he might have avoided being detained, arrested, and handcuffed, or whether he had any right to make a phone call or to speak with an attorney.

48.     At no time did the officer inform Mr. George of any rights he retained, including the right to speak with an attorney, the right to remain silent, or the right to leave the airport rather than get on the flight.  Neither did the officer inform Mr. George on what grounds he was being detained or arrested, how long he would be detained, or how he might have avoided being detained, arrested, and handcuffed.

49.     Mr. George was handcuffed and arrested by Officer Rehiel at approximately 2:20 in the afternoon.

### Incarceration for several hours

50.     Defendant Rehiel led Mr. George to a jail cell in the airport police station. The officer walked into the cell with Mr. George.

51.     The officer asked Mr. George whether he had "ever been arrested before." Mr. George replied, "No.  Am I being arrested now?"  The officer responded, "No. You are just being detained."

52.     The officer then exited the cell and locked the door behind him.  He did not remove Mr. George's handcuffs.  No one ever provided Mr. George with any reason or explanation for why he was put into and kept in handcuffs.

53.     Mr. George remained handcuffed in the cell for approximately two hours. He was able to determine the passage of time by looking at a clock visible through a window in the door of his cell.

54.     The cell contained a tile bench and had several windows, including the one in the door of the cell.  Mr. George was able to move around the cell.  He could observe what was occurring in the police station by looking out the door's window.

55.     Mr. George observed the activities in the police station while he was detained in the cell.  He saw that his carry-on items, including the bag containing his speakers, his wallet, and his flashcards had been brought to the station.  These items had been placed on a table.

56.     At no point from the moment he was handcuffed until his release from the police station did anybody tell Mr. George that he had the right to make a phone call or to contact an attorney.

57.     Mr. George observed several police officers, including Defendants Rehiel and Richards, search through his bag and wallet.

58.     Approximately 15 minutes after Mr. George was incarcerated in the jail cell, Defendant Rehiel took the $30 of cash that was inside Mr. George's wallet, opened Mr. George's jail cell, placed the cash inside Mr. George's pocket, and then exited the jail cell, locking the door behind him.  He did not remove Mr. George's handcuffs.

59.     The officers searching Mr. George's bag appeared to be particularly interested in the flashcards, and also in a student ID card that had been issued to Mr. George in connection with his study abroad program in Jordan.

60.     Approximately two hours after he was first incarcerated, Mr. George saw at the police station an officer who appeared to be a duty sergeant, Defendant Richards. Some time later, Defendant Richards came to Mr. George's cell and asked whether Mr. George had diabetes or a heart condition.  Mr. George responded that he did not, but asked whether he could use the restroom.  Defendant Richards made no comment about the fact that Mr. George was handcuffed, but directed Defendant Rehiel to uncuff Mr. George and permitted Mr. George to use the restroom.

61.     Defendant Richards escorted Mr. George to the restroom, which was located approximately four feet from the cell.  The restroom's door was kept open while Mr. George used the restroom.  Mr. George was then escorted back into to the cell by Defendant Richards, who exited the cell and locked it, leaving Mr. George alone once again.  Mr. George was not put back into handcuffs.

62.     Before Defendant Richards left, Mr. George asked why he was being held. Defendant Richards responded: "I don't know. What did you do?"  Mr. George responded: "I don't know.  Learn Arabic?"

<u>Interrogation</u>

63.     Some time after Mr. George was returned to his cell without handcuffs, two detectives—John Does 4 and 5—arrived at the police station wearing plainclothes. Upon information and belief, John Does 4 and 5 were both employees of the Philadelphia Police Department, one of whom was affiliated with the Philadelphia Police Department's Homeland Security Unit and the other with the FBI's Joint Terrorism Task Force.  Mr. George observed that the Philadelphia police officers appeared to treat the detectives with deference and respect.  It appeared that the police officers had been expecting and waiting for the detectives to arrive.  During Mr. George's incarceration, the Philadelphia police officers had called various federal and state agencies including the JTTF and the PPD-HS in order to arrange for Mr. George to be interrogated while in custody.

64.     John Does 4 and 5 searched Mr. George's carry-on items, including opening Mr. George's stereo speakers to inspect their insides.

65.     Mr. George was subsequently escorted out of his cell by John Does 4 and 5 and led to a room inside the police station containing a large table and several chairs. Mr. George was seated near one end of the table.  One detective was seated at the head of the table next to Mr. George and the other was directly across from Mr. George.

66.     The detectives never informed Mr. George of any rights that he retained. They did not inform Mr. George that he had the right to contact an attorney or that he had the right not to answer questions or to remain silent.  Mr. George was detained during this interrogation, he was not free to leave, and the property that had been seized from him was at this time still in the possession of John Does 4 and 5, and Philadelphia police defendants.  Mr. George reasonably believed that he was obligated to answer all of the detectives' questions.  The detectives did not inform Mr. George that he was free to leave until the end of the interrogation.

67.     John Does 4 and 5 interrogated Mr. George for approximately 30 minutes. Mr. George responded truthfully to all questions and maintained a calm and respectful demeanor throughout.

68.     The detectives asked Mr. George to identify himself, and proceeded to ask a large number of questions about his personal and educational background, his religious and political beliefs, his prior travels, and other personal matters.

69.     At one point during the interrogation, the agents asked Mr. George if he knew why he was being held.  Mr. George replied that he did not.  One of the detectives responded, in part, by calling Mr. George a "f---ing idiot."

70.     John Does 4 and 5 had obtained Mr. George's passport.  Upon reviewing its pages, they asked a series of questions about his time in Egypt, Sudan, Ethiopia, and

Malaysia.  The detectives asked Mr. George how he had traveled from one place to another, whom he had met while traveling, and whether he had met anybody who was "overtly against the U.S. government."  Mr. George answered all of these questions truthfully and accurately.

71.    The detectives asked Mr. George whether he had ever joined a terrorist group.  Mr. George responded that he had not.  One detective asked Mr. George: "Are you Islamic?"  Mr. George responded that he was not.  The detective followed up, asking whether Mr. George was a member of any "pro-Islamic groups" on campus.  Again, Mr. George responded that he was not.  The detective asked whether Mr. George was part of any "communist groups" on campus.  Yet again, Mr. George responded that he was not.  These answers, like all of Mr. George's responses, were truthful and accurate.

72.    The detectives' questioning was wide-ranging and strayed far from any conceivable criminal activity.  During their questioning, for example, the John Does 4 and 5 repeatedly asked Mr. George why he had chosen to study physics at a liberal arts college such as Pomona.

73.    After approximately 30 minutes of questioning, one of the detectives concluded as follows: "Our job is more an art than a science.  The police call us to evaluate whether there is a real threat.  You are not a real threat."  At this point, the detectives indicated that Mr. George was free to leave.

74.    Mr. George was released from custody at approximately 7:00 in the evening, nearly five hours after being handcuffed and arrested and well over five hours after he was first detained by the TSA defendants.

75.     Mr. George never received an apology from anyone involved in his detention, arrest, incarceration, or interrogations.

### Post-release

76.     Mr. George returned to the airport Terminal.  His belongings had been returned to him after John Does 4 and 5 indicated to him that he was free to leave.  He had long since missed the flight on which he was originally scheduled to travel.  He approached the Southwest Airlines ticket counter.  Airline staff were on the phone.  Mr. George observed that they appeared to be having a telephone conversation with the two detectives who had just released him.  Eventually, a Southwest Airlines staff member emerged from a back room and informed Mr. George that he would have to wait until the next day to get a flight.

77.     Mr. George then called his father to pick him up from the airport.  Mr. George explained to his father over the telephone what had transpired.  Mr. George's father called the local FBI office while en route to the airport.  The person with whom he spoke at the FBI office would neither confirm nor deny anything about Mr. George's detention and interrogation, and refused to give his name.

78.     Mr. George's father arrived at the airport with Mr. George's mother and brother.  Mr. George's father attempted to speak with somebody from the TSA to discuss what had happened.  He was able to speak only with a low-level TSA employee who had not been involved in the prior events.  The conversation was not productive.

79.     Mr. George and his father then went to the airport police station.  Mr. George's father spoke with Sergeant Richards at the station.  They spoke for some time.  Mr. George's father thanked the sergeant for having removed the handcuffs from his son.

The sergeant acknowledged that he had removed the handcuffs but was otherwise extremely defensive.  He would neither admit not confirm anything else.  The sergeant offered no apology.

80.    The next day, Mr. George returned to the Philadelphia International Airport.  He boarded a Southwest Airlines flight destined for Phoenix without incident. He also boarded the connecting flight from Phoenix to Ontario, California without incident.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:

**Unconstitutional Search and Seizure – Fourth Amendment to the U.S. Constitution, §1983, and *Bivens***

81.     The detention, arrest, unnecessary and extended restraint, incarceration, and interrogation of the Plaintiff by the Defendants, as described in paragraphs 1-80, constituted an unreasonable search and seizure in violation of clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### SECOND CLAIM FOR RELIEF:

**Excessive Use of Force – Fourth Amendment to the U.S. Constitution and § 1983**

82.     The detention, arrest, unnecessary and extended restraint, and incarceration of the Plaintiff by Defendants Rehiel and Richards, as described in paragraphs 1-80, constituted an excessive use of force in violation of clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### THIRD CLAIM FOR RELIEF:

**Unconstitutional infringement of the Freedom of Speech – First Amendment to the U.S. Constitution, § 1983, and *Bivens***

83.     The detention, arrest, unnecessary and extended restraint, incarceration, interrogation, and search of the Plaintiff by the Defendants on the basis of the flashcards and the book carried by the Plaintiff, as described in paragraphs 1-80, infringed Plaintiff's freedom of speech and constituted unconstitutional retaliation in violation of clearly established rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

## FOURTH CLAIM FOR RELIEF:

### Federal Tort Claims Act – False Arrest

84.     Plaintiff's detention and arrest without probable cause or any other lawful grounds, as described in paragraphs 1-80, constitute the tort of false arrest under the laws of the Commonwealth of Pennsylvania.

85.     Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## FIFTH CLAIM FOR RELIEF:

### Federal Tort Claims Act – False Imprisonment

86.     Plaintiff's detention and imprisonment without probable cause or any other lawful grounds, as described in paragraphs 1-80, constitute the tort of false imprisonment under the laws of the Commonwealth of Pennsylvania.

87.     Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## SIXTH CLAIM FOR RELIEF:

### Federal Tort Claims Act – Battery and Assault

88.     The handcuffing, post-arrest pat-down and other unauthorized contacts with Plaintiff's person, as well as the imminent apprehension of such unauthorized contacts, as described in paragraphs 1-80, constitute the torts of battery and assault under the laws of the Commonwealth of Pennsylvania.

89.     Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.


### SEVENTH CLAIM FOR RELIEF:

**Federal Tort Claims Act – False Light**

90.     Plaintiff was detained, abusively interrogated, handcuffed, arrested, and forced to walk to the airport police station in plain view of numerous members of the public, as described in paragraphs 1-80.  These actions constitute the tort of false light under the laws of the Commonwealth of Pennsylvania.

91.     Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.


### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment including:

(a) Compensatory damages in an amount to be determined at trial;

(b) Punitive damages in an amount to be determined at trial as to all Defendants except the United States of America;

(c) Reasonable attorneys' fees and costs of suit;

(d) Prejudgment interest; and

(e) Such other relief as the Court deems appropriate and just.


### PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully Submitted,

Ben Wizner, *pro hac vice*
Jonathan Manes, *pro hac vice*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
(212) 549-2500 (phone)
(212) 549-2583 (facsimile)
bwizner@aclu.org
jmanes@aclu.org

_____
Mary Catherine Roper (PA No. 71107)
American Civil Liberties Union Foundation of
Pennsylvania
P.O. Box 40008
Philadelphia, PA  19106
(212) 592-1513 ext. 116
mroper@aclupa.org

David Rudovsky (PA No. 15168)
Kairys, Rudovsky, Messing & Feinberg, LLP
718 Arch Street
Suite 501S
Philadelphia, PA 19106

*Counsel for Plaintiff Nicholas George*

Dated:  August 13, 2010