UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NICHOLAS GEORGE,

      Plaintiff,

      v.

WILLIAM REHIEL, *et. al*,

      Defendants.

No. 2:10-cv-586 (EL)
ECF Case

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE
INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS**

BEN WIZNER, *pro hac vice*
JONATHAN MANES, *pro hac vice*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
(212) 549-2500 (phone)
(212) 549-2583 (facsimile)
bwizner@aclu.org
jmanes@aclu.org

MARY CATHERINE ROPER (PA No. 71107)
M. M. TACK-HOOPER (PA No. 307828)
American Civil Liberties Union Foundation of
Pennsylvania
P.O. Box 40008
Philadelphia, PA  19106
(212) 592-1513 ext. 116 (phone)
(212) 592-1343 (facsimile)
mroper@aclupa.org
mtack-hooper@aclupa.org

DAVID RUDOVSKY (PA No. 15168)
Kairys, Rudovsky, Messing & Feinberg, LLP
718 Arch Street
Suite 501S
Philadelphia, PA 19106

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................................i

**INTRODUCTION**................................................................................................................ 1

**FACTS**................................................................................................................................... 3

**ARGUMENT** ...................................................................................................................... 6

   I.   PLAINTIFF'S ALLEGATIONS STATE A PLAUSIBLE CLAIM THAT THE TSA
        AND JTTF DEFENDANTS VIOLATED CLEARLY ESTABLISHED RIGHTS AND
        MAY BE HELD INDIVIDUALLY LIABLE FOR THOSE VIOLATIONS.................... 6

      A.  Plaintiff's complaint meets *Iqbal*'s "plausibility" standard. ............................................ 6

      B.  The Third Circuit takes a broad view of when the law is clearly established so as to
           preclude the government's claim of qualified immunity. ................................................ 7

      C.  The complaint demonstrates that the Doe Defendants are individually liable for
           violating plaintiff's constitutional rights. ......................................................................... 10

  II.  DEFENDANTS VIOLATED PLAINTIFF'S FOURTH AMENDMENT RIGHTS BY
        DETAINING HIM FOR MORE THAN FIVE HOURS WITHOUT PROBABLE
        CAUSE OR REASONABLE SUSPICION OF ANY CRIMINALITY, AFTER IT HAD
        BEEN DETERMINED THAT PLAINTIFF POSED NO THREAT TO AIRLINE
        SAFETY................................................................................................................................ 15

      A.  Defendants' detention of the plaintiff for more than five hours cannot be justified as
           an airport checkpoint stop and violates clearly established law setting out the limits
           of such suspicionless seizures. ...................................................................................... 16

      B.  Defendants' detention of the plaintiff for more than five hours cannot be justified as
           an investigatory stop or arrest and violates clearly established law that governs such
           seizures. ......................................................................................................................... 20

  III.  DEFENDANTS VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHTS BY
        RETALIATING AGAINST HIM FOR EXERCISING HIS CLEARLY ESTABLISHED
        RIGHT TO POSSESS AND STUDY ARABIC-ENGLISH FLASHCARDS AND A
        BOOK CRITICAL OF U.S. FOREIGN POLICY. .......................................................... 25

**CONCLUSION**................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Adams v. James*, 784 F.2d 1077 (11th Cir. 1986) ........................................................ 32

*Anderson v. Creighton*, 483 U.S. 635 (1987) ................................................................. 8

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................... 6, 7, 13, 27

*Baker v. Monroe Twp.*, 50 F.3d 1186 (3d Cir.1995) .................................................... 12

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) .................................................................. 28

*Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971)* ................................... 5, 27

*Burns v. County of Cambria*, 971 F.2d 1015 (3d Cir. 1992) ........................................ 8

*Bush v. Lucas*, 462 U.S. 367 (1983) ............................................................................ 27

*Dunaway v. New York*, 442 U.S. 200 (1979) ............................................................... 22

*Eichenlaub v. Twp. of Indiana*, 385 F.3d 274 (3d Cir. 2004) ................................ 27, 28

*Florida v. Royer*, 460 U.S. 491 (1983) ............................................................ 22, 25, 26

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ................................... 6, 7, 15

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................... 7, 8

*Hartman v. Moore*, 547 U.S. 250 (2006) .................................................................... 27

*Hayes v. Florida*, 470 U.S. 811 (1985) ....................................................................... 22

*Hope v. Pelzer*, 536 U.S. 730 (2002) ............................................................................. 9

*Illinois v. Lidster*, 540 U.S. 419 (2004) ...................................................................... 20

*Johnson v. Campbell*, 332 F.3d 199 (3d Cir. 2003) ................................................... 23

*Kaupp v. Texas*, 538 U.S. 626 (2003) ......................................................................... 22

*Kelly v. Borough of Carlisle*, --- F.3d ---, No. 09-2644, 2010 WL 3835209 (3d Cir. Oct. 4, 2010) ..................................................................................................... 9, 10, 29

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) .............................................................. 28

*Kopec v. Tate*, 361 F.3d 772 (3d Cir. 2004) ....................................................... 8, 9, 10

*Lit v. United States*, No. 04-cr-6192, 2007 WL 1725199 (E.D. Pa. Jun. 12, 2007)...............24, 29

*Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990).........................................................21

*Michigan v. DeFillippo*, 443 U.S. 31 (1979) .....................................................................................23

*Monroe v. Beard*, 536 F.3d 198 (3d Cir. 2008)................................................................................28

*O'Connor v. City of Newark*, 440 F.3d 125 (3d Cir. 2006) ....................................................30, 31

*Pearson v. Callahan*, 129 S. Ct. 808 (2009) .......................................................................................8

*Reedy v. Evanson*, 615 F.3d 197 (3d Cir. 2010)..........................................................8, 12, 13, 15

*Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir.1988) ...............................................................12, 13

*Saucier v. Katz*, 533 U.S. 194 (2001).....................................................................................................8

*Shqeirat v. U.S. Airways Group, Inc.*, 645 F. Supp. 2d 765 (D. Minn. 2009) .......................24, 25

*Singleton v. Comm'r of Internal Revenue*, 606 F.2d 50 (3d Cir. 1979) .....................................17

*Stanley v. Georgia*, 394 U.S. 557 (1969) ..........................................................................................28

*Sterling v. Borough of Minersville*, 232 F.3d 190 (3d Cir. 2000) ...........................................9, 10

*Suppan v. Dadonna*, 203 F.3d 228 (3d Cir. 2000) .........................................................................30

*Sutton v. Rasheed*, 323 F.3d 236 (3d Cir. 2003) .............................................................................12

*Terry v. Ohio*, 392 U.S. 1 (1968) .......................................................................................................23

*Three Mile Island v. Nuclear Regulatory Comm'rs*, 747 F.2d 139 (3d Cir. 1984).......................9

*United States v. $124,570 U.S. Currency*, 873 F.2d 1240 (9th Cir. 1989)..................................18

*United States v. Albarado*, 495 F.2d 799 (2d Cir. 1974)................................................................18

*United States v. Aukai*, 497 F.3d 955 (9th Cir. 2007) (en banc) ...........................................17, 18

*United States v. Brahm,* 520 F. Supp. 2d 619 (D.N.J. 2007) ........................................................29

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ................................................................25

*United States v. Cortez*, 449 U.S. 411 (1981) .................................................................................23

*United States v. Cothran*, 286 F.3d 173 (3d Cir. 2002) .........................................................24, 29

*United States v. Davis*, 482 F.2d 893 (9th Cir. 1973) ....................................................................17

*United States v. Fofana*, 620 F. Supp. 2d 857 (S.D. Ohio 2009) .................................................. 18

*United States v. Hartwell*, 436 F.3d 174 (3d Cir 2006), *cert denied*, 549 U.S. 945
    (2006) ......................................................................................................... 17, 18, 20

*United States v. Leal*, 235 F. App'x 937 (3d Cir. 2007) ....................................................... 26, 27

*United States v. Marquez*, 410 F.3d 612 (9th Cir. 2005) ........................................................ 17, 18

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) ............................................................ 20

*United States v. Place*, 462 U.S. 696 (1983).................................................................... 21, 25, 26

*United States v. Sharpe*, 470 U.S. 675 (1985)................................................................................ 27

*Williams v. Bitner*, 455 F.3d 186 (3d Cir. 2006) ........................................................................ 10

*Wilson v. Layne*, 526 U.S. 603 (1999) ........................................................................................... 8

**Statutes**

42 U.S.C. § 1983 ............................................................................................................................ 5

## INTRODUCTION

In August 2009, Plaintiff Nicholas George, a 21-year old Philadelphia resident and student at Pomona College, was detained, abusively interrogated, handcuffed, and locked in a jail cell for several hours solely because he was carrying a deck of Arabic-English flashcards and a book critical of U.S. foreign policy. He brings this lawsuit to vindicate his Fourth Amendment right to be free from unreasonable seizures and his First Amendment right against retaliation for possessing constitutionally protected educational materials.

In seeking to dismiss this action on its pleadings, defendants ask this Court to hold that a five-hour detention in the absence of any criminal suspicion is constitutionally permissible as a matter of law. To justify this extraordinary assertion, defendants are compelled to distort both the relevant facts and the controlling law. They do so by seeking to divide Mr. George's five-hour ordeal into discrete and shorter units, urging the court to treat each period in isolation and to limit the responsibility of each defendant to brief and purportedly reasonable periods of detention. Yet the complaint expressly alleges that each of the federal defendants was directly involved in detaining Mr. George and in instructing the local police to prolong his detention. At the pleading stage, the court must accept those allegations as true. And under the law of this circuit, *all* of the defendants are liable for Mr. George's unlawful detention.

No reasonable official could have believed that Mr. George's five-hour detention was constitutionally permissible. The Fourth Amendment allows suspicionless administrative stops at the airport for the limited purpose of searching for weapons and explosives; those searches must last no longer than is reasonably necessary to achieve that end. There is no authority for the startling proposition that an administrative search may extend for many hours after its legitimate purpose has been achieved, nor for the odd notion that a search can be justified on

flight-safety grounds long after the person being searched has missed his flight.  While the administrative search doctrine authorized defendants to conduct a limited investigation of Mr. George and his belongings, that authority was exhausted as soon as their thorough search turned up nothing that would endanger airline safety.

Thereafter, Mr. George's seizure amounted to an investigatory detention, and it escalated to an arrest when the local police handcuffed and jailed Mr. George at the defendants' behest. But investigatory detention and arrest are constitutional only if supported by reasonable suspicion of criminal activity and by probable cause of a specific crime, respectively. Few Fourth Amendment rules are more clearly established.  And it could hardly be clearer that neither Mr. George's flashcards, nor his book, nor any other fact alleged in the complaint gave rise to reasonable suspicion, let alone probable cause, of criminal activity.  Indeed, while the government suggests that Mr. George's detention was supported by reasonable suspicion, it wholly neglects even to explain what criminal activity Mr. George was suspected of engaging in.

But even if the pleaded facts somehow added up to reasonable suspicion, clearly established law requires the government to investigate such suspicions quickly and diligently. Those standards are violated when the government leaves an individual locked in a cell for four hours without taking any steps to investigate its "reasonable" suspicions.

The First Amendment violation is equally apparent: government officials cannot retaliate against individuals for possessing First Amendment protected materials.  The government cannot be heard to argue that certain words, when written in Arabic, are legitimate targets for adverse actions, at least in the absence of an actual threat or evidence of criminality.  There was no such threat or criminal activity here.

If the government is correct that Mr. George has failed to state a claim as a matter of law, then airport officials are free to imprison air travelers for hours at a time on the basis of nothing more than their possession of written materials that include certain words, or on the basis of pernicious stereotypes about particular languages.  That never has been and is not the law.  The government's motion should be denied, and this case should proceed to discovery.

### FACTS

Plaintiff Nicholas George was a 21-year old college student flying to California to resume his studies at Pomona College when he was detained, abusively interrogated, handcuffed, and jailed because he was carrying a deck of Arabic-English flashcards and a book critical of American interventionism abroad.  *See* Amended Complaint for Damages ¶ 1 (hereinafter "Am. Compl.").

Mr. George's detention began properly enough: he was held at the airport checkpoint for no more than 15 minutes while Transportation Security Administration ("TSA") agents (Does 1 and 2) conducted a thorough search of his carry-on items for weapons and explosives.  *Id*. ¶¶ 22-23, 27-28.  Does 1 and 2 found no evidence whatsoever that Mr. George posed a threat to airline safety.  But instead of allowing him to go on his way, Does 1 and 2 detained Mr. George for an additional 15 to 20 minutes while waiting for a TSA supervisor to arrive.  *Id.* ¶¶ 28-33.  Mr. George was then abusively interrogated and further detained for 15 minutes by a TSA supervisor (Jane Doe 3).  *Id.* ¶¶ 33-41.  That interrogation plainly revealed that Mr. George was regarded as "suspicious" because of the Arabic-English flashcards that he had in his possession.  *Id.* ¶¶ 37-40 ("You know who did 9/11? . . . Do you know what language he spoke? . . . Do you see why these cards are suspicious?").

Mr. George explained to the TSA defendants that he was using the flashcards (which included, among dozens of words, the Arabic translations of "bomb" and "explosives") in order to learn Arabic vocabulary to pursue his studies at Pomona and so that he could read the Arabic press. *Id.* ¶ 26, 40.  The flashcards did not provide probable cause or reasonable suspicion to believe that Mr. George was involved in a terrorist plot.  The thorough search conducted by Does 1 and 2 revealed absolutely no evidence that Mr. George was actually carrying any weapons or explosives. Mr. George made no threatening statements and said or did nothing else that would lead a reasonable official to regard him as a threat.

Nevertheless, the TSA agents further escalated Mr. George's already unlawful detention by summoning the local police and directing them to take Mr. George into custody.  *Id.* ¶¶ 5-6. Defendant Rehiel, a Philadelphia police officer, handcuffed Mr. George immediately upon arriving at the airport screening area, clearly at the direction of the TSA.  *Id.* ¶¶ 42-46. Defendant Rehiel took Mr. George to the airport jail where he was locked in a cell.  *Id.* ¶¶ 50-52. Mr. George was left in the cell for more than four hours.  Mr. George was kept in handcuffs for the first two hours of this incarceration.  *Id.* ¶ 53.

It is clear from the complaint that the local police were holding Mr. George on behalf of the federal defendants and that they had detained Mr. George specifically for further questioning by the two JTTF officers named as defendants in this case (John Does 4 and 5).[1]  During Mr.

---

[1] The complaint describes John Does 4 and 5 as Philadelphia Police Department ("PPD") detectives.  John Doe 4 was "affiliated with the Philadelphia Police Department's Homeland Security Unit" and John Doe 5 was affiliated with the "FBI's Joint Terrorism Task Force."  Am. Compl. ¶¶ 9, 63.  The defendants' brief, however, describes *both* Does 4 and 5 as JTTF officers and claims them as agents of the federal government.  F. Defs.' Br. 3  While the relationship between the federal government and Does 4 and 5 is unclear, it may well be the case that both had in fact been deputized by the federal government to work with the FBI at the JTTF.  For the sake of clarity, Plaintiff follows the government in describing both Does together as the "JTTF Defendants."  And for the purposes of this motion, plaintiff agrees that they should be treated as

George's four-hour imprisonment, the local police asked Mr. George no questions and took no other meaningful steps to investigate whatever unfounded suspicions they may have had.  Nor did anyone explain to Mr. George why he was being held.  *Id.* ¶¶ 48, 51, 62.  When the two JTTF defendants finally arrived after approximately four hours, the local police "had been expecting and waiting for the detectives to arrive," and had in fact called the JTTF "in order to arrange for Mr. George to be interrogated."  *Id.* ¶ 63.  Mr. George has therefore alleged that his detention by the PPD was on behalf of, and at the direction of, the federal defendants, and was in any case prolonged by the JTTF defendants' four-hour delay in arriving.[2]

When they finally arrived at the police station, the JTTF defendants proceeded to interrogate Mr. George for 30 minutes, further prolonging his arrest and detention.  *Id.* ¶ 67.  The interrogation strayed far from any concern about flight safety.  *Id.* ¶¶ 68-72 (recounting JTTF defendants' questions on matters including plaintiff's personal and religious beliefs, travel, educational background, associations and other information).  The JTTF defendants' questions make clear that they were investigating unsubstantiated suspicions that Mr. George was somehow involved in terrorism or dubious political activities.  The questions also reveal that the

---

agents of the federal government.  Plaintiff, however, does not foreclose the possibility that discovery may reveal that one or both of them should properly be regarded as a state official liable under 42 U.S.C. § 1983 rather than *Bivens*.

 [2] The defendants erroneously state that Mr. George was incarcerated for only two hours before the Joint Terrorism Task Force ("JTTF") defendants arrived. *See* Mem. in Supp. of Individual Fed. Defs.' Mot. to Dismiss 3 (hereinafter "F. Defs.' Br.").  The complaint expressly alleges that Mr. George was arrested by the local police at 2:20pm, ultimately released nearly five hours later at 7:00pm, and that he spent all of the intervening time locked in the jail cell, except for a short trip to the restroom and the JTTF defendants' 30-minute interrogation. *See* Am. Compl. ¶ 49 (alleging that plaintiff was arrested at approximately 2:20pm); *id.* ¶ 74 (alleging that Mr. George was ultimately released from the airport jail at 7:00pm); *id.* ¶¶ 50-52 (alleging that Mr. George was led directly into the cell upon arrest); *id.* ¶ 67 (alleging that Mr. George's interrogation at the police station lasted 30 minutes).

JTTF defendants did not have probable cause to believe that Mr. George was involved in a crime and that their suspicions were far-fetched and unreasonable.  *See, e.g.*, *id.* ¶ 71 (JTTF defendant asking Mr. George whether he was a member of "pro-Islamic" or "communist" groups on campus).

Like the TSA defendants, the JTTF officers were engaged in a fishing expedition prompted by their unreasonable and unwarranted suspicions of Mr. George's Arabic-language flashcards.  Mr. George filed this action to seek redress for his five-hour ordeal and to vindicate his constitutional rights to be free from unreasonable seizure and unlawful retaliation

## ARGUMENT

I.   PLAINTIFF'S ALLEGATIONS STATE A PLAUSIBLE CLAIM THAT THE TSA
     AND JTTF DEFENDANTS VIOLATED CLEARLY ESTABLISHED RIGHTS
     AND MAY BE HELD INDIVIDUALLY LIABLE FOR THOSE VIOLATIONS.

   A.  Plaintiff's complaint meets *Iqbal*'s "plausibility" standard.

Mr. George has alleged with great specificity that the individual TSA and JTTF defendants (collectively, the "Doe Defendants") were responsible for his five-hour detention based on nothing more than his possession of First Amendment-protected materials: Arabic-English flashcards and a book by a prominent U.S. conservative criticizing U.S. foreign policy.

In assessing the sufficiency of a complaint on a motion to dismiss, the court "must accept all of the complaint's well-pleaded facts as true."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Furthermore, the complaint "need only set forth sufficient facts to support plausible claims."  *Id.* at 212 (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).  This is not a high bar.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  The complaint describes with uncommon detail Mr. George's travails at the airport and sets out the Doe Defendants' direct involvement in his

unconstitutional detention.  Notwithstanding the government's assertion to the contrary, F. Defs.'

Br. 4, 8, the complaint's allegations clearly "permit the court to infer more than the mere

possibility of misconduct."  *Iqbal*, 129 S. Ct. at 1950.  Indeed, as discussed in detail below, the

complaint contains more than enough "factual content" to allow the court to "draw the

reasonable inference that the defendant[s are] liable."  *Id.* at 1949.[3]

      B.  <u>The Third Circuit takes a broad view of when the law is clearly established so as</u>
          <u>to preclude the government's claim of qualified immunity.</u>

Qualified immunity shields official conduct from liability for civil damages where that

conduct "does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When

qualified immunity is raised on a motion to dismiss, the court undertakes a two-part inquiry to

determine (1) whether, "[t]aken in the light most favorable to the party asserting the injury . . .

the facts alleged show the officer's conduct violated a constitutional right," and (2) whether the

constitutional right at issue was "clearly established."  *Reedy v. Evanson*, 615 F.3d 197, 223-24

(3d Cir. 2010) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (alterations in original).  If

the right at issue was not clearly established, then qualified immunity is appropriate even if

plaintiff's rights were violated.

Whether a right is clearly established turns on the "objective legal reasonableness of the

[defendant's] action, assessed in light of the legal rules that were clearly established at the time it

---

[3] At the pleading stage, the court must accept plaintiff's allegations not only about what transpired, but also about the defendant's motivations.  *See, e.g.*, *Fowler*, 578 F.3d at 212 (accepting as true plaintiff's allegation that she was "terminated because she was disabled"). This court must therefore accept that plaintiff was detained "solely because he passed through an airport screening checkpoint with a set of Arabic-English flashcards and a book critical of American foreign policy."  Am. Compl. ¶ 1.  The government may not at this stage posit alternative rationales for defendants' actions.  *See, e.g.*, F. Defs.' Br. 18 (suggesting that Mr. George was detained in part because of the countries to which he had traveled).

was taken," *Pearson v. Callahan*, 129 S. Ct. 808, 822 (2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)), and does not depend on the subjective intentions or motives of the defendants, *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  Contrary to the government's suggestion, officials do not obtain the protection of qualified immunity simply by pleading that they "acted reasonably under the circumstances."  F. Defs.' Br. 8.  Rather, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."  *Harlow*, 457 U.S. at 818-19.

The Third Circuit "has adopted a broad view of what constitutes an established right of which a reasonable person would have known."  *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) (quoting *Burns v. County of Cambria*, 971 F.2d 1015, 1024 (3d Cir. 1992)).  Specifically, the court of appeals has held that "[i]n determining whether a right is clearly established, it is not necessary that the exact set of factual circumstances has been considered previously."  *Kelly v. Borough of Carlisle*, --- F.3d ---, No. 09-2644, 2010 WL 3835209, at * 9 (3d Cir. Oct. 4, 2010). "'[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances,' as long as the law gave the defendant officer 'fair warning' that his conduct was unconstitutional," *id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Accordingly, this court should not accept the government's invitation to define the right in question with inordinate specificity.  *See* F. Defs.' Br. at 7.  While it is undoubtedly true that the court must identify the specific right alleged to have been violated, the court must not insist that qualified immunity attaches unless a very similar or identical set of facts has been previously adjudicated.  To do so would be to ignore the Circuit's warning that "we would not be 'faithful to the purposes of immunity by permitting . . . officials one liability-free violation of a constitutional or statutory requirement.'" *Kopec*, 361 F.3d at 778 (quoting *Three Mile Island v.*

*Nuclear Regulatory Comm'rs*, 747 F.2d 139, 144-45 (3d Cir. 1984); *see also Sterling v. Borough of Minersville*, 232 F.3d 190, 198 (3d Cir. 2000) (holding that police violated clearly established law "notwithstanding the fact that the very action in question had not previously been held unlawful").

Consistent with this approach, the court of appeals has frequently defined the rights at stake in particular cases with only modest particularity.  In *Kopec*, for example, the Third Circuit rejected a claim of qualified immunity because it broadly held that "the use of excessive force by officers in effecting an arrest" was a clearly established right.  *Kopec*, 361 F.3d at 778.  In *Sterling*, the court of appeals held that a police officer's threat to publicize information about an individual's sexual orientation violated clearly established law, because "the right to privacy is well-settled" and "because the confidential and private nature of the information was obvious." *Sterling*, 232 F.3d at 198.  *See also Kelly*, 2010 WL 3835209, at *6 ("At the time of Kelly's arrest, it was clearly established that an arrest could be made only on the basis of probable cause.").

The Third Circuit has also instructed that when assessing whether the law was sufficiently clear, district courts must look to the decisions of sister circuits and the district courts.  *See, e.g.*, *Williams v. Bitner*, 455 F.3d 186, 192-93 (3d Cir. 2006) ("If the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising.  To that end, we routinely consider decisions by other Courts of Appeals as part of our 'clearly established' analysis when we have not yet addressed the right asserted by the plaintiff.") (internal quotation and citations omitted); *id* at 193 n.7 ("[District Court] opinions . . . may be relevant to the 'clearly established' determination."); *Kopec*, 361 F.3d at 777-78

9

(holding, in light of precedents from the Ninth Circuit, that the use of excessive force in effecting an arrest was a clearly established violation of the Fourth Amendment).[4]

    C.  <u>The complaint demonstrates that the Doe Defendants are individually liable for violating plaintiff's constitutional rights.</u>

Mr. George was detained for more than five hours, Am. Compl. ¶ 74, without probable cause or even reasonable suspicion of criminality.  Yet the defendants seek to evade liability for this clearly excessive and unconstitutional detention by dividing Mr. George's detention into short slices; by limiting each defendant's liability to a particular portion; and by insisting on the reasonableness of each period of the detention viewed in isolation.  The government's argument misconstrues both the facts of this case and the law that governs it.

The allegations demonstrate that all of the defendants were responsible for each other's conduct in prolonging Mr. George's detention for more than five hours without constitutional warrant.  The TSA defendants not only detained Mr. George for approximately 30 minutes after they had exhausted the scope of their lawful administrative search, Am. Compl. ¶¶ 27-30, but they also summoned the local police to arrest Mr. George and to hold him for further questioning by other federal agents.  Am. Compl. ¶¶ 5-6.  The local police then held Mr. George for four hours at the direction of the TSA and on behalf of the JTTF defendants, keeping him in custody until the JTTF agents arrived.  *See supra* pp. 4-5.  That the federal defendants were responsible for Mr. George's entire detention – and not merely discrete slices of it – is shown by the

---

    [4] Taking account of the decisions of other circuits is particularly appropriate in this instance, because airport security is a federal responsibility administered primarily by federal agencies and officials according to nationally uniform standards.  Furthermore, because the defendants are federal agents, it is reasonable to expect them to know and abide by the leading authority from the federal appellate courts throughout the country.

uncontroverted fact that the JTTF agents had sole authority to release Mr. George from custody and end his five-hour detention.  Am. Compl. ¶¶ 73-74.

The government nevertheless urges that the TSA defendants can be held liable, if at all, only for "the initial security screening and questioning, " F. Defs.' Br. 9, wholly ignoring that the TSA summoned law enforcement to arrest (or at least continue detaining) Mr. George. Likewise, the government contends that the JTTF defendants' "personal participation was minor," limited to "prolonging [plaintiff's] detention for approximately 30 minutes," F. Defs.' Br. 12-13 (internal quotation omitted), once again ignoring that those 30 minutes were only the last phase in a nearly five-hour arrest that took place at the behest of the TSA defendants and was prolonged by the local police because they were waiting for the JTTF defendants to arrive.  The Doe Defendants' motion to dismiss is thus predicated entirely upon carving the government's actions into discrete, temporal tranches.  This attempt to divide and evade responsibility fails. The allegations plainly demonstrate that all of the Doe Defendants participated in and are liable for the entirety of plaintiff's unconstitutional ordeal.

The Third Circuit has held that an individual need not be physically present or even directly involved in every aspect of a constitutional violation in order to be liable for it.  Rather, all that is required is "personal involvement in the alleged wrongs."  *Sutton v. Rasheed*, 323 F.3d 236, 249 (3d Cir. 2003) (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988)) (internal quotation marks omitted).  Personal involvement can be established by alleging that a defendant "participated in violating [plaintiff's] rights, or . . . directed others to violate them, or . . . as the person in charge . . . had knowledge of and acquiesced in his subordinates' violations." *Reedy*, 615 F.3d at 231 (quoting *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir.1995)) (internal quotation marks omitted).

In the face of this controlling circuit precedent, the Doe Defendants misread the Supreme Court's decision in *Ashcroft v. Iqbal* as permitting – or even requiring – the court to divide the violation of Mr. George's rights into segments attributable only to particular individual defendants. F. Defs.' Br. 8-9. But nothing in *Iqbal* even remotely supports the government's view. *Iqbal* was a case about the liability of *supervisors* – the Attorney General and FBI Director – for the allegedly unconstitutional conduct committed by distant subordinates. The Court reaffirmed that in *Bivens* actions, supervisors are liable only for their own conduct and "may not be held accountable for the misdeeds of their agents" on a theory of "vicarious liability." *Iqbal*, 129 S. Ct. at 1948-49. *Iqbal* does *not* purport to establish a new rule about the liability of officers, like the defendants in this case, who were "on the ground" and *directly* involved in the unconstitutional events.

In any case, the notion that individuals are "liable for [their] own misconduct" was well established in the Third Circuit long before *Iqbal*. *See Rode*, 845 F.2d at 1208 ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."). And it has never been doubted this rule is perfectly consistent with imposing liability on individuals who are personally involved – along with other officials – in a course of conduct that violates the Constitution. Indeed, *after* the Supreme Court decided *Iqbal*, the court of appeals reiterated the traditional rule that individuals who "participate in," "direct," or "know[] of and acquiesce in" constitutional violations can be held individually liable. *Reedy,* 615 F.3d at 231.[5]

---

[5] It is worth emphasizing the implications of the government's sweeping interpretation of *Iqbal*. On the government's theory, even a week-long detention unsupported by probable cause or reasonable suspicion might pass constitutional muster if it were comprised of hundreds of "reasonable" 30-minute detentions at the hands of separate officials. The Constitution does not permit the government to evade the Fourth Amendment by playing "hot potato" with a citizen.

Judged against these long-established principles, the allegations in the complaint amply demonstrate that the TSA and JTTF defendants are liable for plaintiff's detention.  All of the defendants either participated in Mr. George's five-hour detention, directed it, or both.  The TSA defendants John Doe 1 and 2 directly participated by detaining Mr. George after any valid justification for the stop expired.  Am. Compl. ¶ 28.  They unlawfully detained Mr. George after they completed their administrative search, *id.* ¶¶ 28, 30, and they called in the TSA supervisor, Jane Doe 3, to prolong the unlawful seizure, *id.* ¶ 29.  Jane Doe 3 continued Mr. George's unlawful detention while interrogating him regarding matters wholly unrelated to airline safety. *Id.* ¶ 33-40 ( "You know who did 9/11? . . . Do you know what language he spoke? . . . Do you see why these cards are suspicious?").  The TSA agents further participated by summoning the Philadelphia Police Department to arrest Mr. George and continue his detention in the airport jail. *Id.* ¶ 42-46.[6]  In calling in the local police, the TSA agents not only "participated in" the

---

[6] The government's contention that plaintiff has "only alleged that the TSA defendants participated in the initial security screening and questioning" is incorrect.  F. Defs.' Br. 9.  The complaint explicitly alleges that John Does 1 and 2 "summoned . . . the Philadelphia Police Department for further interrogation, detention, and arrest of Mr. George" and that Jane Doe 3 "turned [plaintiff] over to Defendant Rehiel to be handcuffed, arrested, jailed, and further interrogated."  Am. Compl.  ¶¶ 5-6.  Additional allegations in the complaint show that TSA agents called the Philadelphia Police Department to have them further detain Mr. George.  The Philadelphia police officer who arrested Mr. George did not witness the TSA search and interrogation, but immediately handcuffed Mr. George on arrival and led him away. *Id.* ¶ 42-45. The arresting officer stated that he was "taking [Mr. George] for extra screening," clearly indicating that he was acting at the direction of the TSA, which had of course been conducting the "screening" up to that point. *Id*. ¶ 46.  There is no plausible explanation for the Philadelphia police officer's actions – immediately handcuffing and detaining Mr. George – except that he was acting at the direction of the TSA defendants.  Other allegations in the complaint further support the conclusion that the federal defendants were directing the local police's detention of the plaintiff. *See, e.g.*, *id.* ¶ 62 (quoting defendant Richards stating that he did not know why Mr. George was being held); *id.* ¶ 63 ("[T]he police officers had been expecting and waiting for the [JTTF Defendants] to arrive").  The federal defendants' brief itself supports the conclusion that the TSA officers directed the local police to continue Mr. George's detention, indicating that it is standard protocol "to contact law enforcement personnel" when TSA agents encounter a "passenger who presents security concerns."  F. Defs.' Br. 10 n.7.  As such, on the present

prolonged unlawful detention, but also "directed others to violate" Mr. George's rights, and they can be held liable on that basis as well. *Reedy*, 615 F.3d at 231.[7]

The JTTF defendants' direct participation in plaintiff's unlawful seizure is equally clear. They not only prolonged Mr. George's nearly five-hour unlawful arrest by interrogating him for 30 minutes without probable cause or even reasonable suspicion, Am. Compl. ¶ 63-74, but they were also responsible for the four hours that Mr. George spent in the airport jail cell prior to their arrival. The complaint explicitly alleges that the local police were waiting for the JTTF defendants to arrive after they had called in the JTTF. *Id.* ¶ 63. Furthermore, it is reasonable to infer that the JTTF defendants directed the local police to hold Mr. George until they arrived. In any case, the complaint clearly indicates that the JTTF defendants understood that they, and they alone, held the keys to Mr. George's freedom and that their delay in arriving at the police station would prolong Mr. George's arrest. *Id.* ¶ 73 (quoting one JTTF defendant stating "The Police call us to evaluate whether there is a real threat" and thereafter telling Mr. George he was free to leave). As such, the JTTF defendants, too, cannot evade responsibility for Mr. George's lengthy detention.

---

complaint, the government's attempt to distance the TSA defendants from the conduct of the local police is utterly without merit.

   [7] The complaint sets forth how each TSA defendant participated in Mr. George's unconstitutional detention. *Id.* ¶¶ 5-6, 23-42. These allegations clearly suffice to show that all three agents personally participated in the course of conduct that violated Mr. George's rights. Remarkably, the government suggests that plaintiff's complaint might be inadequate because it does not include minute details about, for example, whether it was Doe 1 or Doe 2 who "swabbed [plaintiff's] cell phone" while the other "made a phone call." F. Defs.' Br. 9 n.7. A plaintiff can hardly be expected to remember and recount such trivial details months after the events in question. Rather, plaintiff need only "set forth sufficient facts to support plausible claims" against each defendant, a standard that the complaint clearly exceeds. *Fowler*, 578 F.3d at 212. In the unlikely circumstance that a defendant's liability may turn on such minutiae, plaintiff's allegations entitle him to fact discovery on those points.

II.    DEFENDANTS VIOLATED PLAINTIFF'S FOURTH AMENDMENT RIGHTS BY
DETAINING HIM FOR MORE THAN FIVE HOURS WITHOUT PROBABLE
CAUSE OR REASONABLE SUSPICION OF ANY CRIMINALITY, AFTER IT
HAD BEEN DETERMINED THAT PLAINTIFF POSED NO THREAT TO
AIRLINE SAFETY.

The government contends that both the TSA and the JTTF defendants' seizure of Mr.

George was lawful under the administrative search doctrine that governs airport checkpoint

stops.  F. Defs.' Br. 9-12 (stating that TSA's actions were an administrative search); *id.* at 13

(stating that the actions of Does 4 and 5 were "an extension of the airport search . . . and should

be evaluated for reasonableness under the airport security standard.").  The government is

incorrect.  Under clearly established law, plaintiff's prolonged detention plainly exceeded the

bounds of a permissible administrative search at an airport checkpoint.  The administrative

search rationale for plaintiff's detention expired after approximately ten to fifteen minutes, when

the thorough search for weapons and explosives turned up nothing.  Thereafter, Mr. George's

detention became an investigative detention justifiable only upon reasonable suspicion of

criminality.  Once Mr. George was handcuffed and taken to the airport jail to be incarcerated, his

seizure clearly amounted to an arrest for Fourth Amendment purposes, and as such could be

justified only on probable cause.  Yet the facts disclose no basis at all for probable cause or

reasonable suspicion that would justify criminal detention.  What's more, defendants' conduct

*also* violates clearly established Fourth Amendment standards governing the conduct of

investigatory detentions.  *See infra* sec. II.B.

The government does not – and could not – suggest any plausible rationale for regarding

Mr. George as a threat to airline safety *or* as a criminal simply because he had a deck of

flashcards that included among them the translations for words like "terrorist" and "bomb."  The

flashcards were no threat.  The government's repeated attempt to analogize Mr. George's mere

possession of flashcards to uttering bomb threats or planting fake explosives strains credulity.

A. Defendants' detention of the plaintiff for more than five hours cannot be justified as an airport checkpoint stop and violates clearly established law setting out the limits of such suspicionless seizures.

Airport security screening falls within the "administrative search" doctrine and ordinarily does not require individualized suspicion of criminality. *United States v. Hartwell*, 436 F.3d 174, 178-79 (3d Cir 2006), *cert denied*, 549 U.S. 945 (2006). The Third Circuit was careful to emphasize that administrative checkpoint stops pass constitutional muster only where "the procedure is tailored to advance [the state's interest in preserving air travel safety] while proving to be only minimally invasive . . . ." *Id.* at 181. The case law demonstrates that the stop in this case far exceeded those constitutional limits.

Suspicionless searches at airports are permissible to "preserv[e] air travel safety," *id.*, by searching for "weapons or explosives that could be used to hijack an airplane," *Singleton v. Comm'r of Internal Revenue*, 606 F.2d 50, 52 (3d Cir. 1979). Other courts are in accord that the sole legitimate purpose of an administrative airport stop is to detect weapons or explosives. *See, e.g.*, *United States v. Aukai*, 497 F.3d 955, 962 (9th Cir. 2007) (en banc) ("A particular airport security screening search is constitutionally reasonable provided that it is no more extensive nor intensive than necessary, in light of current technology, to detect the presence of weapons or explosives [ ][and] that it is confined in good faith to that purpose." (quoting *United States v. Davis*, 482 F.2d 893, 913 (9th Cir. 1973)); *United States v. Marquez*, 410 F.3d 612, 616 (9th Cir. 2005) (same); *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1243 (9th Cir. 1989) ("To the extent that administrative searches are used for purposes other than those contemplated by the regulatory scheme, they may fall outside the rationale by virtue of which we have approved them."); *United States v. Albarado*, 495 F.2d 799, 805 (2d Cir. 1974) (warning against "the possibility that the purpose of the airport search may degenerate from the original search for weapons to a general search for contraband"); *see also United States v. Fofana*, 620 F. Supp. 2d

857, 863 (S.D. Ohio 2009) (collecting cases).[8]  As such, under clearly established law, a

reasonable official would know that once he conclusively determined that an individual did not

possess weapons or explosives, any further seizure could not be justified as an administrative

stop.

In the present case, the TSA agents completed their legitimate administrative search for

weapons and explosives within ten to fifteen minutes.  Am. Compl. ¶ 28.  In addition to x-raying

Mr. George's carry-on baggage, they carefully inspected all of his possessions by hand and twice

swabbed his carry-on items to test for explosives.  *Id.* ¶¶ 27-28.  Once Does 1 and 2 had

completed those searches, they had exhausted the legitimate bounds of an administrative search,

and any further detention could be justified solely by criminal suspicion.

Indeed, the complaint reveals that during the balance of Mr. George's seizure at the

airport checkpoint, the TSA defendants themselves appreciated that Mr. George was not carrying

any items that could be used to endanger airline safety.  After their initial search of Mr. George's

possessions, Does 1 and 2 made no further efforts to uncover weapons or explosives or other

means of jeopardizing airline safety, but engaged only in idle chit-chat in order to prolong Mr.

George's detention for the 30 minutes it took for Jane Doe 3 to arrive.  *Id.* ¶¶ 28-30, 33.  Jane

Doe 3, in turn, was not interested in whether Mr. George had weapons or explosives, but was

principally concerned with the deck of flashcards that Mr. George possessed – an item which can

hardly be regarded as a threat to air travel safety.  Doe 3's hostile interrogation of Mr. George

clearly indicated that she was not at all concerned about weapons or explosives – or any other

---

[8] The Third Circuit has cited sister circuit case law – and in particular the Ninth Circuit's law – with approval.  *See Hartwell*, 436 F.3d at 177, 179, 180 & n.10 (citing *United States v. Marquez*, 410 F.3d 612).  The Ninth Circuit has likewise relied on the Third Circuit's decision in *Hartwell*.  *See Aukai*, 497 F.3d at 960, 962.

actual threats to airline safety – but rather with farfetched and baseless suspicions that Mr. George's study of Arabic somehow indicated involvement in terrorist plots. *Id.* ¶¶ 33-40.

The JTTF defendants' participation in Mr. George's seizure violated clearly established law for the same reason: by the time they were involved it was unequivocally clear that Mr. George was carrying neither weapons nor explosives.  In any case, it is absurd to suggest, as the government does, that the JTTF defendants' conduct can be characterized as an administrative airport search.  Mr. George had long since been denied boarding of his flight, which had departed without him. *Id.* ¶ 76.  The government makes no attempt to explain how a seizure can be justified on flight-safety grounds when the individual in question will not be boarding a flight.

The search and seizure at issue here violated clearly established rules governing airport checkpoints not simply because the defendants detained Mr. George long after the legitimate purpose of the stop had been achieved, but also because defendants failed to conduct the search in the "minimally invasive" manner that is required.

In *Hartwell,* the court of appeals held that no constitutional violation had occurred where "the procedures involved . . . were well tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search."  436 F.3d at 180.  Plaintiff's flashcards did not disclose a reason to conduct a more probing search.  The fact that among the many vocabulary words included in the flashcards were the translations for words such as "terrorist" and "bomb" – a  fact upon which the government lays great emphasis – is immaterial in this regard.[9]  But even if the defendants were correct that the flashcards could justify a somewhat "more probing search," the reasonableness of that search

---

[9] Indeed, as discussed below, the flashcards do not even give rise to reasonable suspicion of criminality necessary to justify an investigative detention.  *See infra* sec. II.B.

expired as soon as it was conclusively determined that Mr. George had no dangerous items in his possession.

Likewise, the sheer length of Mr. George's seizure and the sluggishness with which defendants investigated whatever suspicions they might have had compels the conclusion that his clearly established constitutional rights were violated.  The Supreme Court's decisions uniformly emphasize that in order to pass constitutional muster, suspicionless administrative stops must be brief – no longer than necessary to effectuate the purpose of the stop.  *See Illinois v. Lidster*, 540 U.S. 419, 427 (2004) (upholding a police checkpoint because "each stop required only a brief wait in line – a very few minutes at most. Contact with the police lasted only a few seconds."); *United States v. Martinez-Fuerte*, 428 U.S. 543, 546-547 (1976) (upholding a checkpoint in which "the average length of an investigation in the secondary inspection area is three to five minutes"); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 448 (1990) (upholding a checkpoint where "the average delay for each vehicle was approximately 25 seconds").  Mr. George was detained for more than *five hours*.  Far shorter airport seizures have been held unconstitutional even where, unlike here, officials had reasonable suspicion of criminality.  *See, e.g.*, *United States v. Place*, 462 U.S. 696, 709 (1983) (holding, in assessing a 90-minute detention at the airport to search for narcotics, that "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause").[10]

---

[10] Moreover, Mr. George's five-hour detention included long stretches of time during which the defendants undertook no efforts at all to investigate whether he possessed weapons or explosives or otherwise had the means to endanger flight safety.  *See United States v. Place*, 462 U.S. at 709 ("[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation.").

B.  <u>Defendants' detention of the plaintiff for more than five hours cannot be justified
as an investigatory stop or arrest and violates clearly established law that governs
such seizures.</u>

The government's attempt to justify the defendants' conduct on an administrative search

rationale fails.  Aside from the initial legitimate search for weapons and explosives, Mr.

George's entire detention amounts to an investigatory detention that escalated to an arrest when

he was handcuffed and locked up at the airport jail.  Defendants' conduct therefore passes

constitutional muster only if it was justified by the ordinary Fourth Amendment standards

applicable in the criminal context: the existence of reasonable suspicion to justify a brief

investigative detention or probable cause to justify an arrest.[11]

The period of detention after the legitimate administrative search and until the arrival of

the local police officer constituted an investigative detention, which may be justified even though

there is no showing of probable cause "if there is articulable suspicion that a person has

committed or is about to commit a crime."  *Florida v. Royer*, 460 U.S. 491, 498 (1983).  Mr.

George's seizure escalated from an investigatory stop to an arrest when the local police, acting

on the request of the TSA, handcuffed Mr. George, led him to the airport jail, and locked him in

a cell.  The Supreme Court has repeatedly ruled that such actions constitute an arrest that is

constitutional only upon probable cause.  *See Kaupp v. Texas*, 538 U.S. 626, 631 (2003)

(handcuffing and transportation to police station interrogation room constituted arrest); *Hayes v.*

*Florida*, 470 U.S. 811, 816 (1985) (involuntary transport to police station for questioning was

_____

[11] The government argues that its conduct was justified on such grounds in a single footnote.
F. Defs.' Br. 11 n.8.  In one sense, the government's failure to defend its conduct on the grounds
of criminal suspicion is puzzling: the notion that an airport administrative search could last five
hours is extraordinary, and in any case the gravamen of plaintiff's complaint is that he was
subjected to investigatory detention and arrest.  In another light, the government's reticence is
understandable: the allegations demonstrate that Mr. George's seizure was utterly unsupported
by the reasonable suspicion and probable cause that clearly established Fourth Amendment law
requires.

"sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause."); *Dunaway v. New York*, 442 U.S. 200, 212 (1979) (transporting individual to police station and placing him in interrogation room was "indistinguishable from a traditional arrest").  It is of course bedrock Fourth Amendment law that an arrest is constitutional only upon the existence of probable cause.  *See, e.g.*, *Dunaway*, 442 U.S. at 200.[12]  As such, the nearly five hours that Mr. George spent at the airport jail – from his initial imprisonment until he was released by the JTTF defendants – was unconstitutional unless the facts disclosed probable cause to believe that plaintiff had committed or was committing a crime.

On the facts as alleged, the investigatory detention and arrest were unjustified.  The allegations do not disclose "articulable suspicion" that the plaintiff "ha[d] committed or [was] about to commit a crime," *Johnson v. Campbell*, 332 F.3d 199, 209 n.7 (3d Cir. 2003), let alone the more stringent probable cause required for arrest.  Reasonable suspicion requires "something more substantial than an 'inchoate and unparticularized suspicion or a 'hunch.''" *Johnson*, 332 F.3d at 206 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  Rather, the detaining officials "must be able to point to 'some objective manifestation that [Plaintiff was], or [was] about to be, engaged in criminal activity." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

The defendants do not make a serious attempt to articulate how any of Mr. George's conduct or possessions gave rise to a reasonable inference that he was involved in a crime. There is absolutely no authority for the proposition that learning words essential to understanding the Arabic press – Mr. George's actual objective in learning Arabic – can give rise

---

[12] "Probable cause 'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Johnson v. Campbell*, 332 F.3d 199, 211 (3d. Cir. 2003) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

21

to an inference of criminality.  Nor can it be the case that any student of Arabic who travels to the Middle East is reasonably suspected of criminality.  In fact, defendants are silent as to precisely *what* criminal conduct they reasonably suspected Mr. George to have been involved in. In any case, the interrogation conducted by Jane Doe 3 demonstrates that the defendants' actual suspicions were patently *unreasonable*: that Osama Bin Laden speaks Arabic does not render any student of the Arabic language a proper target of reasonable suspicion.

Nor do the allegations disclose probable cause of any crime justifying Mr. George's arrest.[13]  The government's only argument – that the facts alleged here are somehow analogous to cases involving bomb threats – is frivolous.  *See* F. Defs.' Br. 16-18.  Mr. George made no threat – he was simply carrying educational materials for private use.  Carrying language study aids in one's pocket is not a "threat" that can give rise to criminal suspicion.  The cases cited by the government involve *actual threats* (and prosecutions) under statutes criminalizing such threats.  In one case cited, the individual made false bomb threats that were reasonably regarded as genuine.  *United States v. Cothran*, 286 F.3d 173 (3d Cir. 2002).  In another, the individual planted a fake bomb.  *Lit v. United States*, No. 04-cr-6192, 2007 WL 1725199 (E.D. Pa. Jun. 12, 2007).  It is indeed extraordinary that the government, which is charged with protecting the constitutional rights of all citizens, would suggest that Mr. George's conduct in this case is even remotely analogous.

---

[13] Contrary to the Doe Defendants' suggestion that only the local police can be held liable for Mr. George's arrest, the principles discussed above, *supra* sec. I.C, show that they too are liable for Mr. George's arrest because they "participated in" or "directed" it.  The TSA Defendants participated in and directed the arrest by calling in the local police to remove Mr. George for questioning.  *See supra* p. 4.  The JTTF participated by failing to arrive at the station for four hours while Mr. George was arrested and by interrogating him for 30 minutes while he remained under arrest.  *Id*. pp. 5-6.

Arrests and detentions may not be predicated on unfounded and generalized suspicions of the kind that motivated defendants' actions here.  In *Shqeirat v. U.S. Airways Group, Inc.*, the plaintiffs, Middle Eastern men, were praying loudly, chanting the word "Allah" and later talking about Saddam Hussein and cursing the U.S. involvement in Iraq.  645 F. Supp. 2d 765, 785 (D. Minn. 2009).  Plaintiffs were detained and arrested.  The court held that the plaintiffs' conduct at the airport fell short of "leading a reasonable officer to conclude there was probable cause that a crime was being or had been committed" and denied the defendants qualified immunity on the ground that "no reasonable officer could have believed they could arrest Plaintiffs without probable cause."  *Id.* at 780, 785.  This case presents an even clearer violation of the Fourth Amendment.  No reasonable official could conclude that probable cause existed to arrest a college student who had traveled to the Middle East and was in possession of study-aids translating certain Arabic words.  Indeed, these circumstances do not even give rise to a reasonable suspicion of criminal activity.

Finally, even if the court were somehow to determine that Mr. George's five-hour detention could be regarded as nothing more than an investigatory stop (rather than an arrest), *and* even if the court were to agree that the facts alleged disclosed reasonable suspicion justifying such an investigatory detention, the court must *still* conclude that defendants violated clearly established law that governs the length and conduct of investigatory detentions.  It is clearly established that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  *Royer*, 460 U.S. at 500; *accord United States v. Place*, 462 U.S. 696, 709-10 (1983); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975).  Furthermore, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Royer*,

460 U.S. at 500; *see also United States v. Leal*, 235 F. App'x 937, 941 (3d Cir. 2007) ("In

considering whether a stop is so minimally intrusive as to be justifiable on reasonable suspicion,

courts consider the duration of the stop, the law enforcement purposes justifying the stop,

whether the police diligently sought to carry out those purposes given the circumstances, and

alternative means by which the police could have served their purposes.") (internal quotation

marks and citations omitted).  Plaintiff's allegations demonstrate violations of each of these

clearly established rules.

  The sheer length of Mr. George's five-hour detention – combined with defendants'

lassitude about investigating any supposed suspicions – constitute a violation of clearly

established limits on investigative seizures unsupported by probable cause.  Cases that have

elaborated on the requirement that such seizures "last no longer than is necessary to effectuate

the purpose of the stop," *Royer*, 460 U.S. at 500, establish that a five-hour detention cannot be

justified.  *See Place*, 462 U.S. at 709 (finding that a 90-minute airport seizure was too long, even

where there was reasonable suspicion that passenger possessed drugs); *Leal*, 235 F. App'x 937 at

942 (stating that an 80-minute investigatory stop "bumped up against the outer limit of a *Terry*

stop" and upholding it only because the defendant was "diligent in his attempts to further

investigate . . . and his efforts to expeditiously resolve his suspicions were frustrated by

circumstances beyond his control.").  Here, there were many hours of "delay unnecessary to the

legitimate investigation of law enforcement officers," and the defendants clearly did not

"diligently pursue[] a means of investigation that was likely to confirm or dispel their suspicions

quickly, during which time it was necessary to detain [Mr. George]."  *Leal*, 235 F. App'x at 941

(quoting *United States v. Sharpe*, 470 U.S. 675, 676, 685 (1985)).  Instead, defendants left Mr.

George waiting for long stretches while no actions whatsoever were taken to investigate

whatever suspicions purportedly existed.  For this independent reason, defendants' five-hour

seizure of the plaintiff exceeded clear constitutional limits.

III.   DEFENDANTS VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHTS BY
RETALIATING AGAINST HIM FOR EXERCISING HIS CLEARLY
ESTABLISHED RIGHT TO POSSESS AND STUDY ARABIC-ENGLISH
FLASHCARDS AND A BOOK CRITICAL OF U.S. FOREIGN POLICY.

The defendants violated plaintiff's clearly established First Amendment rights by

burdening his right to possess Arabic flashcards and a book critical of U.S. foreign policy and

retaliating against him for exercising that right.[14]  The Third Circuit has endorsed a three-part test

for First Amendment retaliation claims.  *See* F. Defs.' Br. 15.  A plaintiff alleging retaliation

must show: "(1) that he engaged in constitutionally-protected activity; (2) that the government

responded with retaliation; and (3) that the protected activity caused the retaliation."  *Eichenlaub*

*v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004).  Under clearly established law, plaintiff's

complaint satisfies each prong of the test.

First, it is clearly established that the First Amendment protects plaintiff's right to possess

and study the flashcards and book that he was carrying.  As in all First Amendment cases, the

court must "begin with the proposition that, except for certain narrow categories deemed

unworthy of full First Amendment protection . . . all speech is protected by the First

Amendment."  *Id.* at 282-83.  Furthermore, "it is now well established" that the First

Amendment protects not only the individual's right to speak, but also "the right to receive

_____

[14] The Supreme Court has confirmed that a cause of action for damages is available under
*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) for claims of retaliation in violation
of the First Amendment.  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  The government's
suggestion to the contrary is thus incorrect.  F. Defs.' Br. 24 n.13.  Its reliance on *Iqbal* is
inapposite because that case concerned a religious discrimination claim, not a speech claim.  *See*
*Iqbal*, 129 S. Ct. at 1948-49.  *Bush v. Lucas*, 462 U.S. 367 (1983), is equally irrelevant because,
as the government recognizes, in that case there was an alternative administrative remedy for the
First Amendment infringement.  There is no such alternative remedy here.

information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).  *See also*, *e.g.*, *Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) (right to receive information prohibited school officials from removing books from library); *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (citing cases).  By carrying the flashcards and the book with the intent of studying and reading their contents, Mr. George was exercising this clearly established right.  Moreover, it is clearly established that individuals have a bedrock right to read, study and possess First Amendment protected material.  Even in the context of schools and prisons, where First Amendment rights are attenuated, the courts have confirmed the basic right to read and possess First-Amendment protected written material.  *See, e.g. Pico*, 457 U.S. at 854 (holding, despite the special considerations that arise in public schools, that the First Amendment prohibits officials from "remov[ing] books . . . simply because they dislike the ideas contained in those books"); *Monroe v. Beard*, 536 F.3d 198, 209 (3d Cir. 2008) (holding that even prison inmates "retain a broad First Amendment right to view and possess First Amendment materials").  It is irrelevant that there is no case that "directly addresses the factual scenario" at issue here, F. Defs.' Br. 23, because "the law gave the defendant[s] fair warning" that Mr. George was engaging in protected activity.  *Kelly*, 2010 WL 3835209, at *9. (internal quotation marks omitted).

The defendants maintain that "existing case law establishes that carrying flashcards with words like 'bomb' and 'explosion' through airport security is not a protected activity."  F. Defs.' Br. 18.  This is quite wrong.  In the cases upon which defendants rely, individuals were held criminally liable for making bomb threats.  For example, in *United States v. Cothran*, the defendant was convicted because he made repeated false statements suggesting that he would bomb an airplane.  *Cothran*, 286 F.3d at 175 (defendant said "that he wanted to blow a plane out at 35,000 feet" and was heard "talking about 'doing his job and a bomb'").  *United States v. Lit*

concerns an individual who pled guilty to a charge of threatening to use a weapon of mass

destruction by planting a fake bomb in an airport bathroom. *Lit*, 2007 WL 1725199. In both

cases, the court noted that the threats, although fake, were perceived by others to be genuine.

*Cothran*, 286 F.3d at 175-76; *Lit*, 2007 WL 1725199, at *11.[15]

      Simply reciting the facts and rationale of these cases convincingly demonstrates that they

have no bearing on the present case. Mr. George *made no threat*. Indeed, Mr. George did not

communicate *anything* with the flashcards. The flashcards were intended for private study. Mr.

George's conduct at all times was consistent with that objective. Indeed, he did not even take the

flashcards out of his pocket until *ordered to do so* by Does 1 and 2. In any case, the very cases

cited by the defendants make clear that words like "bomb" and "explosive" aren't forbidden *per*

*se* at the airport; rather, they lose First Amendment protection only when they are used in a

manner that could reasonably be regarded as a threat.

      It is ludicrous to propose that because the First Amendment permits the government to

prosecute credible bomb hoaxes, the First Amendment does not protect an individual who does

no more than carry among his personal possessions written materials that contain the word

"bomb."[16] Yet this is precisely the argument to which the government resorts in its attempt to

evade responsibility for infringing Mr. George's First Amendment rights.

---

[15] A third case cited by the government considered the constitutionality of the statute at issue
in *Cothran*, which criminalizes "any conduct with intent to convey false or misleading
information under circumstances where such information may reasonably be believed and where
such information indicates that" any one of various crimes involving, *e.g.*, nuclear, biological,
chemical, or explosive weapons "has taken, is taking, or will take place." *United States v.
Brahm*, 520 F. Supp. 2d 619, 622 (D.N.J. 2007). The court, quite sensibly, held that
intentionally conveying false but credible information that an attack will occur is like "shouting
fire in a crowded theater" and is not protected speech. *Id.* at 626.

[16] Would the government contend that an individual could be prohibited from carrying a copy
of John Hersey's *Hiroshima* in his carry-on? Could the government prevent miners or
demolition experts from carrying professional literature regarding their trades onto a plane? Are

Plaintiff easily satisfies the other two prongs of the test for retaliation.  The government appears not to dispute that an "adverse action" was taken against Mr. George; indeed, it could not.  The Third Circuit has established that an adverse action exists if it is "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights."  *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (internal quotation marks omitted).  This "threshold is very low. . . .  [A] cause of action is supplied by all but truly *de minimis* violations."  *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006).  Indeed, the Third Circuit has stated that "[e]ven an act of retaliation as trivial as failing to hold a birthday party for a public employee" might, in the right circumstances, suffice to "deter a person of ordinary firmness."  *Id.* (internal quotation marks omitted).  Plaintiff's hostile interrogation, humiliating arrest, and five-hour detention – most of which was spent in a locked cell, much of it handcuffed – is more than sufficiently adverse to state a claim.

The complaint also alleges more than enough facts to state a plausible claim that plaintiff's five-hour detention was caused by his exercise of his First Amendment right to possess protected written materials for the purpose of studying and reading them.  The complaint explicitly alleges that Mr. George was "jailed for several hours . . . solely because he passed through an airport screening checkpoint with a set of Arabic-English flashcards and a book critical of American foreign policy."  Am. Compl. ¶ 1.  Contrary to the government's contention that this allegation is merely "conclusory," F. Defs.' Br. 17-18, plaintiff's causal claim is amply supported by many other allegations in the detailed narrative provided by the complaint.  For example, the complaint alleges that Does 1 and 2 examined the flashcards, "flipped through the

---

journalistic accounts of the Oklahoma City bombing properly kept off planes?  All of these works make much more extensive reference to bombs and explosives than do Mr. George's flashcards.  It is obvious that the First Amendment would not tolerate such censorship.

pages of books that Mr. George had," and discussed the flashcards with Jane Doe 3 on the phone. Am. Compl. ¶¶ 27-29. Jane Doe 3's interrogation was quite clearly motivated by the flashcards, which she found "suspicious" because they contained Arabic. *Id.* ¶¶ 37-39. The complaint also alleges that that this portion of the interrogation occurred after Jane Doe 3 noticed Mr. George's book. *Id.* ¶¶ 36-37.

Defendants argue that these allegations do not suffice because it is simply not "plausible" that defendants "retaliated against [Mr. George]," and "it is far more likely that [they] determined that [he] should be questioned because he presented himself at airport security with a series of violent, terrorism-related words written on cards in his pocket and extensive Middle East travel documented in his passport." F. Defs.' Br. 17-18. At the pleading stage, the government is not free to invent alternative rationales that fly in the face of the complaint's well-supported and plausible allegations. The government may put forward its preferred version of events in a motion for summary judgment, after discovery.

In any case, it does the government no good to point to its baseless criminal suspicions of Mr. George as an alternative and more "plausible" rationale for defendants' conduct. On the facts alleged, it would have been apparent immediately to any reasonable officer that Mr. George was a college student studying a foreign language and reading about politics. Defendants cannot recast plaintiff's detention as diligent and responsible airport security work – and thereby avoid the clear infringement of his First Amendment rights – when the detention was itself unlawful.[17]

---

[17] Courts have held that even otherwise lawful investigative detentions can violate the Constitution if the stop is being used as retaliation for the exercise of First Amendment rights. *See Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986). In a case like this one, where the defendants' investigatory conduct was *not* consistent with the Fourth Amendment, it is clear that merely pointing to the government's unreasonable investigatory objective cannot rebut a claim of First Amendment retaliation.

# CONCLUSION

For the foregoing reasons the Doe Defendants' motion to dismiss must be denied.

Respectfully Submitted,

Ben Wizner, *pro hac vice*
Jonathan Manes, *pro hac vice*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
(212) 549-2500 (phone)
(212) 549-2583 (facsimile)
bwizner@aclu.org
jmanes@aclu.org

_____/s/  **Mary Catherine Roper**_____
Mary Catherine Roper (PA No. 71107)
M. M. Tack-Hooper (PA No. 307828)
American Civil Liberties Union Foundation of
Pennsylvania
P.O. Box 40008
Philadelphia, PA  19106
(212) 592-1513 ext. 116 (phone)
(212) 592-1343 (facsimile)
mroper@aclupa.org
mtack-hooper@aclupa.org

David Rudovsky (PA No. 15168)
Kairys, Rudovsky, Messing & Feinberg, LLP
718 Arch Street
Suite 501S
Philadelphia, PA 19106

*Counsel for Plaintiff Nicholas George*

Dated:  November 11, 2010

30

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NICHOLAS GEORGE,

     Plaintiff,

     v.

WILLIAM REHIEL, *et. al*,

     Defendants.

No. 2:10-cv-586 (EL)
ECF Case

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I caused a copy of the Plaintiff's Memorandum in Opposition to the Individual Federal Defendants' Motion to Dismiss to be filed electronically. It is available for viewing and downloading from the ECF System of the U.S. District Court for the Eastern District of Pennsylvania. Counsel for all parties have consented to be served electronically and will be served via the ECF System.

                                              /s/ **Mary Catherine Roper**
                                      Mary Catherine Roper (PA No. 71107)
                                      American Civil Liberties Union Foundation of
                                      Pennsylvania
                                      P.O. Box 40008
                                      Philadelphia, PA  19106
                                      (212) 592-1513 ext. 116
                                      mroper@aclupa.org

                                      *Counsel for Plaintiff Nicholas George*

Dated:  November 11, 2010