IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLAS GEORGE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| WILLIAM REHIEL, et al. | : | NO. 10-586 |

**ORDER**

Ludwig, J.                                                                                       October 28, 2011

The "United States' and Individual Federal Defendants' Unopposed Motion for Clarification" (doc. no. 41) is ruled on as follows:

1. It is acknowledged that movant's statement of the law of qualified immunity is substantively correct.

The amended complaint contains sufficient factual allegations of specific conduct on the part of each defendant that, if true, constitute violations of plaintiff's First and Fourth Amendment rights.

According to the amended complaint, plaintiff Nicholas George arrived at the Philadelphia International Airport on August 29, 2009, bound for California to resume his studies at Pomona College. He obtained a boarding pass and showed TSA his identification. At the security checkpoint x-ray device, he put his carry-on bags and personal items on the conveyor belt. He emptied his pockets of metal, took off his shoes, and walked through the detector, which made no sound. He was directed to an adjacent area where a TSA screener (Doe 1) asked him to empty his pockets. He did so, removing a set of translation flashcards,

each with Arabic words on one side and English on the other. The screener inspected the flashcards and then took plaintiff to a different area, where that screener and another (Doe 2) detained him for 15 minutes while they inspected his belongings. He was not carrying weapons, explosives, or items that posed a safety risk. He was not carrying anything suggestive of criminal or prohibited activity. He did not say or do anything threatening or provocative.

Although the TSA screeners completed their search of plaintiff's carry-on items, they detained him for an additional 15-20 minutes. One screener flipped through pages of a book critical of United States foreign policy. The other screener stepped away and made a phone call, speaking for some time with a TSA official about plaintiff's screening and the flashcards. The screeners summoned a TSA supervisor (Doe 3) and the Philadelphia Police Department (PPD) for further detention, questioning, and eventual arrest of plaintiff.

The TSA supervisor arrived and questioned plaintiff for 15 minutes, asking: "You know who did 9/11? . . . Do you know what language he spoke? . . . Do you see why these cards are suspicious?" Am. Compl. ¶¶ 37-40. Plaintiff explained that he was using the flashcards to learn Arabic and read the Arabic press. Defendant PPD officer William Rehiel arrived, interrupted the TSA supervisor mid-sentence, and without explanation ordered plaintiff to place his hands behind his back. The supervisor turned plaintiff over to Rehiel, who then handcuffed plaintiff and took him through the terminal in plain view of the traveling public to the airport police station.

Plaintiff was held in a locked cell at the station for about four hours, in handcuffs for more than two hours. From the cell, plaintiff saw several PPD officers, including defendants Rehiel and Edward Richards, Jr., search through his bag and wallet. The officers appeared to be interested in the flashcards and a student ID card that had been issued for a study abroad program plaintiff had attended in Jordan. The officers called various federal and state agencies, including the PPD's Homeland Security Unit and the Joint Terrorism Task Force (JTTF) to make arrangements for plaintiff to be questioned.

About four hours later, two plain-clothed individuals, who had been deputized by the FBI to the JTTF, arrived at the police station. They questioned plaintiff for 30 minutes about his personal and educational background, religious and political beliefs, and prior travels in Egypt, Sudan, Ethiopia, and Malaysia. Concluding the questioning, one JTTF agent stated: "The police call us to evaluate whether there is a real threat. You are not a real threat." Am. Compl. ¶ 73. The JTTF agents indicated that plaintiff was free to leave.

Plaintiff is alleged to have been arrested and handcuffed at 2:20 p.m. and released at 7:00 p.m. During that time, he was not informed why he had been detained, handcuffed, and arrested or how long he would be detained. Plaintiff was not informed of any rights to speak with an attorney, remain silent, or leave the airport.

The amended complaint plausibly sets forth a Fourth Amendment violation. Airport security screening of passengers and their baggage, without a warrant or individualized suspicion of wrongdoing, is permissible under the "administrative search doctrine." United

States v. Hartwell, 436 F.3d 174, 177-78 (3d Cir.), cert. denied, 549 U.S. 945 (2006). Such searches are permissible "when a court finds a favorable balance between the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Id. at 178-79 (citations and internal quotation marks omitted). Our Court of Appeals has declined to "set the outer limits of intrusiveness in the airport context" or "devise any bright-line test" to implement this standard in future cases. Id. at 180 n.10. Hartwell, however, confirms that routine airport screening is still a "search" subject to Fourth Amendment limitations. Id. at 177.

The procedures employed by defendants, as alleged here, do not appear to have been minimally designed to protect plaintiff's personal privacy and individual liberty rights. The TSA's statutory and regulatory authority appears to have been exhausted after the first 10-15 minutes, once plaintiff was found to possess nothing that would endanger airline safety. 49 U.S.C. § 44901 (TSA empowered to search for explosives or other safety hazards); see United States v. McCarty, 648 F.3d 820, 831 (9th Cir. 2011) ("individual screener's actions [must] be no more intrusive than necessary to determine the existence or absence of explosives that could result in harm to the passengers and aircraft"). Moreover, an investigatory detention and arrest are constitutional only if supported by reasonable suspicion of criminal activity or probable cause of a specific crime. See, e.g., Terry v. Ohio, 392 U.S. 1, 21 & n.18 (1968) ("officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion");

Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995) ("the right to be free from arrest without probable cause" is a "clearly established right"). Here, the amended complaint does not provide a reasonable inference of individualized suspicion or probable cause for the prolonged detention and arrest of plaintiff.

If the facts alleged are true, the TSA's seizure of plaintiff amounted to an investigatory detention, which escalated to an arrest when the PPD handcuffed and locked him in a cell at the direction of the TSA and JTTF. Accordingly, the amended complaint adequately alleges that each individual defendant participated in subjecting plaintiff to an intrusion upon his personal freedom for more than five hours. There were no grounds for reasonable suspicion of any criminality or probable cause. Early on, it was determined that he posed no threat to airline safety.

The amended complaint also plausibly sets forth a First Amendment violation. Except for certain narrow categories, "all speech is protected by the First Amendment." Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282-83 (3d Cir. 2004). The "right to receive information and ideas" is also well established. Kleindienst v. Mandel, 408 U.S. 753, 762-63 (1972); Monroe v. Beard, 536 F.3d 198, 208-09 (3d Cir. 2008) (prisoners retain a broad First Amendment right to view and possess protected materials). To proceed on the retaliation claim, plaintiff must plead "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." Eichenlaub, 385 F.3d at 282.

The factual matter contained in the amended complaint suggests that the entirety of plaintiff's airport experience may fairly be attributable to his possession of materials protected by the First Amendment. Plaintiff was "jailed for several hours . . . solely because he passed through an airport screening checkpoint with a set of Arabic-English flashcards and a book critical of American foreign policy." Am. Compl. ¶ 1. TSA screeners inspected the flashcards and one screener "flipped through the pages of books that Mr. George had" and the other screener discussed the flashcards with their supervisor. Id. ¶¶ 27-29. The TSA supervisor questioned plaintiff because the flashcards were "suspicious." Id. ¶¶ 37-39. "After noticing the book, the TSA Supervisor continued her hostile and aggressive questioning . . . ." Id. ¶¶ 36-37. The amended complaint adequately alleges that each defendant violated plaintiff's rights to read, study, and possess protected materials by arresting and detaining him for his exercise of those rights.

Defendants do not dispute that plaintiff's rights to read, study, and possess these materials were protected, provided he was not at an airport: "carrying flashcards with words like 'bomb' and 'explosion' through airport security is not a protected activity." F. Defs. br. at 18, doc. no. 26.[1] Defendants rely on precedent holding individuals criminally responsible for bomb threats: United States v. Cothran, 286 F.3d 173, 175 (3d Cir. 2002) (threats about carrying a bomb on an airplane); United States v. Lit, No. 07-903, 2007 WL 1725199, at *11-12 (E.D. Pa. June 12, 2007) (fake bomb in airport bathroom); United States v. Brahm, 520

---

[1] Defendants: "[T]here is no First Amendment right to say or write 'bomb' in an airport." F. Defs. br. at 16, 18, doc. no. 26.

F. Supp. 2d 619, 626 (D.N.J. 2007) (law criminalizing phony bomb threats not overly broad because "[s]uch speech would be . . . similar to shouting fire in a crowded theater"). These cases are not apposite. It is alleged here that plaintiff made no threats. He took the flashcards out of his pocket only when ordered to do so by the TSA. He remained polite, calm, and respectful and answered questions truthfully.

The defense of qualified immunity in this case may be clarified by discovery.

2. The order in question also denies the government's motion to dismiss all claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680 that arise from the alleged Pennsylvania common law torts of false imprisonment, false arrest, assault, battery, and false light invasion of privacy. This waiver of immunity generally does not apply to claims of assault, battery, false imprisonment, false arrest, libel, and slander, among other intentional torts. 28 U.S.C. § 2680(h). However, that rule is not applicable to claims arising out of assault, battery, false imprisonment, or false arrest committed by the government's "investigative or law enforcement officers" (defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law"). Id.

According to the government, this court is without jurisdiction to decide the FTCA claims because the alleged torts are based entirely on conduct by non-federal actors, the Philadelphia Police Department. Moreover, there is no waiver because the TSA and JTTF are not "investigative or law enforcement officers" for purposes of the FTCA.

The amended complaint adequately states federal involvement. The factual averments support a plausible inference that the TSA called for and requested the PPD to arrest and take plaintiff into custody. It is alleged that upon officer Rehiel's arrival in the screening area, he ordered plaintiff to place his hands behind his back, without making an independent assessment of the situation. He did not wait for the TSA supervisor to finish speaking before handcuffing plaintiff. Concededly, TSA screeners routinely "call law enforcement officers to search, seize, and arrest individuals" because the screeners do not have the authority to do so. U.S. br. at 13, doc. no. 25. It is averred that plaintiff was cast in a false light when he was led in handcuffs through the terminal "in plain view of other passengers." Am. Compl. ¶ 45. It is also plausible that the JTTF authorized and ratified the PPD's detention of plaintiff: The PPD defendants "prolonged" plaintiff's detention for interrogation by the JTTF. Id. ¶ 8. "It appeared that the police officers had been expecting and waiting for the [JTTF] detectives to arrive." Id. ¶ 63. One JTTF agent said that "[t]he police call us to evaluate whether there is a real threat." Id. ¶ 73. The JTTF defendants searched plaintiff's belongings and questioned him. Id. ¶¶ 64-73.

These issues cannot be decided at this stage. Our Court of Appeals has not decided whether the conduct of state police officers, acting in their work on behalf of a federal agency, can be the basis of a FTCA claim. See Couden v. Duffy, 446 F.3d 483, 499 (3d Cir. 2006) (suggesting a proper record might raise such a claim). The authority and roles played by the JTTF as well as the PPD and FBI at the Philadelphia airport are unclear. Discovery is needed to resolve whether each individual defendant was authorized to execute searches,

seize evidence, or make arrests and if so, by whom, and the actions of each on the day of this incident.

Defendant specifically disclaims liability for the tort of false light because the FTCA reserves the United States' immunity from certain intentional tort claims "arising out of" "libel" or "slander."  28 U.S.C. § 2680(h).  Invasion of privacy and false light are not explicitly barred by the FTCA.  Id.  Under Pennsylvania law, defamation is a distinct tort from false light invasion of privacy.  See Restatement (Second) of Torts § 652E cmt. b; 42 Pa.C.S.A. § 8343.  For purposes of the FTCA, the tort of false light does not arise out of the tort of defamation.  See Quinones v. United States, 492 F.2d 1269, 1275-76 (3d Cir. 1974) (one remedy for defamation did not pre-empt another for negligence under the FTCA). Accordingly, the false light tort claim was allowed to proceed to discovery.

    BY THE COURT:

    /s/ Edmund V. Ludwig
    Edmund V. Ludwig, J.